**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Ondigo LLC | : | |
| | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | |
| v. | : | NO.   2:2020cv01126 |
| | : | |
| intelliARMOR LLC | : | |
| | : | |
| | : | |
| *Defendant* | : | |
| | : | |

**ONDIGO, LLC'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Pursuant to the Court's February 2, 2022 Order, Plaintiff, Ondigo, LLC respectfully submit its Proposed Findings of Fact and Conclusions of Law:

**I.     PROPOSED FINDINGS OF FACT**

1.     This case involves a purchase order entered into between the parties, Ondigo, LLC ("Ondigo") and intelliARMOR, LLC ("intelliARMOR"), through which Plaintiff contracted to purchase various phone accessories for resale (the "Purchase Order").  (Pretrial Stipulation ¶ 1).

2.     Ondigo and intelliARMOR are each commercial businesses.  (N.T. 14:11-19).

3.     The Purchase Order required shipment of goods to Ondigo's warehouse in Pennsylvania.  (Ex. Ondigo 1; Ex. Ondigo 14).

4.     Ondigo submitted the Purchase Order to intelliARMOR on or around July 11, 2019.  (Pretrial Stipulation ¶ 2; Ex. Ondigo 1).

1

5.      Contemporaneously with the Purchase Order, intelliARMOR submitted to Ondigo an invoice for the Purchase Order, dated July 15, 2019 (the "Invoice").  (Pretrial Stipulation ¶ 5; Ex. Ondigo 14).

6.      The Invoice was consistent with the terms of the Purchase Order and added to the terms of the Purchase Order by stating that a deposit in the amount of $45,595.00 was due from Ondigo and by further stating an unlabeled "due date" of September 3, 2019.  (Pretrial Stipulation ¶¶ 5-6; Ex. Ondigo 14).

7.      Ondigo contemporaneously communicated its acceptance of the Invoice. (Pretrial Stipulation ¶ 6).  The Purchase Order and Invoice are hereafter collectively referred to as the "Contract."

8.      The goods ordered through the Contract consisted of three separate types of products: lightning cables, powerbanks, and 3-in-1 wall chargers (collectively, the "Goods").  (Ex. Ondigo 1; Ex. Ondigo 14).  The lightning cables required "Made for iphone" ("MFI") certification prior to production and the 3-in-1 wall chargers required both MFI certification and ETL certification before production.  (Pretrial Stipulation ¶ 11; N.T. 122:4-20).

A.      **Delivery Timing**

9.      The written terms of the Contact were silent regarding any expressly stated deadline for the timing of shipment and delivery of the Goods.  (Pretrial Stipulation ¶ 3).

10.     On June 4, 2019, while the parties were negotiating the Contract, Ondigo asked that intelliARMOR "confirm delivery timing" with respect to the Goods.  (N.T. 28:9-14; Ex. Ondigo 2-2).

11.     On June 5, 2019, intelliARMOR responded to Ondigo's June 4, 2019 request to "confirm delivery timing" by submitting to Ondigo a spreadsheet entitled "intelliarmor forecast & ETA 060519" that included shipment dates for the goods that were ultimately ordered through the Contract.  (Pretrial Stipulation ¶ 7; Ondigo Ex. 2-2; Ondigo Ex. 3).

12.     The June 5, 2019 spreadsheet listed shipping dates via sea ranging from June 15, 2019 to July 30, 2019 (*i.e.*, within 55 days of June 5, 2019).  (Pretrial Stipulation ¶ 7; Ondigo Ex. 3).

13.     During cross examination, Adam Anderson ("Anderson"), President of intelliARMOR, acknowledged that nothing in writing instructed or warned Ondigo that the dates in the June 5, 2019 spreadsheet were merely estimates or that they did not actually confirm delivery timing.  (N.T. 179:2-7).

14.     Beyond the June 4, 2019 request to confirm delivery timing, James Radack ("Radack"), former General Manager of Ondigo, testified that he also discussed delivery timing with intelliARMOR and understood that the goods that were being negotiated would be delivered within 60-90 days.  (N.T. 24:29-24).

15.     Radack also testified that the June 5, 2019 spreadsheet reflected his understanding of how long it would take intelliARMOR to deliver the goods that were being negotiated.  (N.T. 31:14-19).

16.     On June 17, 2019, with respect to the lightning cables that were later included in the Contract, intelliARMOR emailed Ondigo, "The cables need to go through MFI, so that pushes those back a bit."  (N.T. 27:5-16 Ondigo Ex. 2-1).

17.     Prior to Ondigo's assent to the Invoice, beyond notifying Ondigo that the MFI certification process might delay production of the cables "a bit," intelliARMOR did not otherwise communicate to Ondigo any potential delays to the shipment timing described in the June 5, 2019 spreadsheet (*i.e.*, shipment via sea within 55 days).  (N.T. 150:8-151:8).

18.     Accordingly, at the time of its assent to the Invoice, subject to the caveat that the MFI certification process might delay production "a bit," Ondigo was not on notice that the timeframes for shipment represented in the June 5, 2019 spreadsheet, which indicated shipment via sea within 55 days of the date of the spreadsheet, were materially altered at the time of the parties' agreement.

19.     Ondigo therefore reasonably believed that the Goods would be shipped via sea within approximately 55 days from the date of the Purchase Order, subject to the minor delay that was communicated on June 17, 2019 with regard to the MFI certification process.  *See* (N.T. 26:14-21; 31:14-19) (Radack testimony that Ondigo expected the goods to be delivered within 60 to 90 days and that the June 5, 2019 spreadsheet reflected his understanding of shipping time).

20.     Ondigo's belief that the Goods would be shipped via sea within approximately 55 days from the date of the Contract is corroborated by Radack's testimony that managing the timing of shipment and delivery for purchase orders was "kind of central to everything we do"; that managing timing was important in order to avoid price fluctuations in a highly competitive market and in order to free up capital for additional purchases; and that, as a matter of course, Ondigo always confirmed the timing

of shipments and deliveries before placing orders.  (N.T. 28:15-20; 25:5-26:9; 4:19-22; 24:25-25:1-4).

21.    In light of the fact that Ondigo specifically asked to "confirm" delivery timing on June 4, 2019, it would have been incongruous with Radack's testimony for Ondigo to proceed with the Contract if Ondigo was aware that the MFI certification process might foreseeably cause a material delay with respect to the shipment and delivery of the Goods.

22.    To that end, Radack further testified that he had very little understanding of how long the MFI and ETL certification processes might take (N.T. 83:9-22), thus corroborating that, beyond the June 17, 2019 email indicating "a bit" of a potential delay to obtain MFI certifications, Ondigo was not on notice that either certification process might foreseeably cause a material delay to production.

23.    Through September 3, 2019, intelliARMOR consistently communicated its belief that the certification process would be completed and the goods shipped by mid-September, thus corroborating that Ondigo similarly believed that the certification process would be completed by that time.  (Pretrial Stipulation ¶¶ 10, 12, 13).

24.    Anderson testified that Ondigo never communicated to intelliARMOR that there was a deadline for shipment or delivery of the goods.  (N.T. 161:3-9). Notwithstanding the fact that Ondigo specifically sought to confirm the time of shipment through its June 4, 2019 request, the record is devoid of any proof or indication that Ondigo in any manner communicated or suggested that timing of shipment was not important.  On the contrary, Ondigo continued to convey the importance of timing by seeking several updates regarding the status of the Contract, including a September 3,

2019 request for the status of the Contract that corresponded to when intelliARMOR previously represented that the goods would be shipped and an October 17, 2019 request for the status of the Contract that corresponded to when the goods should have been delivered based upon intelliARMOR's prior updates (Pretrial Stipulation ¶¶ 13, 14). Beyond that, Anderson himself acknowledged that prices fluctuated in the market, in which case it would illogical for a purchaser to be ambivalent towards the timing of a purchase order.  (N.T. 112:25-113:7).

25.     Additionally, intelliARMOR acknowledged that shipment had been delayed, thereby indicating that intelliARMOR understood and appreciated that time was of the essence for Ondigo.  (Pretrial Stipulation ¶ 17; Ondigo Ex. 13-5, 13-6).

26.     The weight of testimony and evidence establishes that time was of the essence for the Contract and that the parties agreed that delivery of the Goods would be completed within approximately 55 days, as reflected by the June 5, 2018 spreadsheet.

**B.     Due Date**

27.     The Invoice contained an unlabeled due date of September 3, 2019.  (Ex. Ondigo 14).

28.     Radack understood this due date to refer to the deadline for Ondigo's payment of the balance of amounts due, which, in turn, would have corresponded with delivery and acceptance of the goods.  (N.T. 39:17-40:2).

29.     In contrast, Anderson testified that the due date referred to the deadline for Ondigo's payment of the deposit in order to hold the prices offered by intelliARMOR. (N.T. 112:25-113:13).  However, intelliARMOR presented no written documentation that might have substantiated this alleged price hold deadline.

30.     Anderson's testimony that the due date referred to a price hold deadline is additionally undermined by another contemporaneous invoice, in which the August 16, 2019 due date stated therein in fact coincided with intelliARMOR's delivery of goods. (N.T. 153:12-156:4; Ex. Ondigo 6-1).  Furthermore, there is no logical reason why the price hold deadline for this other invoice would have been nearly one month shorter than that of the September 3, 2019 due date appearing on the Invoice.

31.     Furthermore, the parties treated Ondigo's payment of the deposit on August 6, 2019 as untimely, thereby suggesting that the deposit was due prior to September 3, 2019, in which case the September 3, 2019 due date could not logically have related to a price hold date.  (Ex. intelliARMOR 10).

32.     The weight of testimony establishes that the due date stated in the Invoice referred to the date on which Ondigo was required to pay the balance of amounts due under the Invoice upon delivery and acceptance of the Goods.

**C.     Deposit**

33.     The Invoice stated that a deposit in the amount of $45,595.00 was due. (Pretrial Stipulation ¶ 14; Ex. Ondigo 14).

34.     The terms of the Invoice were silent regarding when the $45,595.00 deposit was due.  (Ex. Ondigo 14).

35.     Anderson testified that payment of the deposit by Ondigo was required before intelliARMOR would begin production of the Goods.  (N.T. 116:6-18).

36.     Radack testified that he did not recall whether or not intelliARMOR notified Ondigo that the deposit was required before intelliARMOR would begin production of the goods.  (N.T. 67:3-10).

37.     Radack further testified as to his understanding that the Purchase Order represented a binding commitment from Ondigo to pay for the goods that were ordered; and that he understood the submission of the Purchase Order to be the event triggering intelliARMOR's production of the goods.  (N.T. 75:12-17).

38.     During cross examination, Anderson testified that production of the powerbanks (which did not require MFI certification) began prior to Ondigo's payment of the deposit, thereby undermining his testimony that payment of the deposit was required before production would begin.  (N.T. 182:18-183:20).

39.     Anderson also testified that the MFI certification process was not part of production; rather, it was an application process that occurred before production could begin.  (N.T. 108:20-109:13).

40.     .The initial stages of the MFI certification process simply entailed the submission of product data (such as product name, model, description, brand mark authorization), an image of the packaging, and an application, along with a $550 application fee.  (Pretrial Stipulation ¶ 11).  Apple would then review the application.  (Id.)

41.     Any delay by Ondigo in paying the deposit therefore did not warrant a delay with respect to the MFI certification process.

42.     Ondigo paid the deposit to intelliARMOR on August 6, 2019, approximately 20 days after its assent to the July 15, 2019 Invoice.  (Pretrial Stipulation ¶ 13; Ex. Ondigo 5-1).

43.     Anderson testified that Ondigo's delay in paying the deposit put production and the MFI certification process into an annual busy season that substantially

delayed production of the goods.  (N.T. 111:4-112:3).  However, Anderson conceded during cross examination that intelliARMOR never notified Ondigo that any delay in paying the deposit might materially delay shipment of the goods in question.  (N.T. 150:14-151:8).  Furthermore, Anderson's updates to Ondigo on August 12, 2019, August 20, 2019, and September 3, 2019 make no mention of any delays consequent to Ondigo's late payment of the deposit.  (Joint Stipulation ¶¶ 10, 12, 13).

44.    Anderson's testimony that Ondigo's approximately 20 day delay in paying the deposit materially delayed production is further undermined by subsequent updates from intelliARMOR through September 3, 2019 that shipment remained substantially on schedule.  (Id.).  If there were no delays at the time of these updates, it is questionable whether Ondigo's delay in paying the deposit could have contributed to the production delay that intelliARMOR claims.

45.    The weight of testimony and evidence establishes that any delay by Ondigo in paying the deposit did not reasonably delay the MFI certification process for the lightning cables and 3-in-1 wall chargers that were ordered through the Contract.

### D.    Communications and Termination

46.    Following Ondigo's payment of the deposit, on August 12, 2019, intelliARMOR emailed Ondigo: "Your Cable & powerbanks are in production.  We are getting MFI setup for your lighting cables and ETL for your wall charger, so we're looking at a September 10th ship date for those.  (Initial setup takes some time).  (Ex. Ondigo 6-1).  This update was substantially consistent with the agreed upon shipping window of approximately 55 days and the due date stated on the Invoice.

47.     On August 20, 2019, intelliARMOR emailed Ondigo with an update that,
"The cables / powerbanks are well underway, just going through MFI and certifications
(always takes longer on the first one)."  (Ex. Ondigo 7-1).  This communication gave no
indication to suggest that the agreed upon shipping window of approximately 55 days did
not remain substantially on schedule; nor did this update indicate that any delay in
payment of the deposit pushed production into a busy season or otherwise materially
delayed production.

48.     On September 3, 2019, upon request from Ondigo, intelliARMOR
provided an update that the Goods would ship in 15 days, in mid-September 2019.
(Pretrial Stipulation ¶ 13; Ex. Ondigo 8-1, 8-2, 9-1, 9-2).  This update again assured
Ondigo that shipment remained substantially on schedule.

49.     Through at least October 8, 2019, intelliARMOR still had not received
confirmation that all required certifications had been approved.  (Ex.
intelliARMOR0051).  Therefore, intelliARMOR provided the September 3, 2019 update
without any knowledge that the MFI certification process had been completed, despite
Anderson's testimony that the timing of the MFI certification process is uncertain.  (N.T.
117:8-20).

50.     In none of the foregoing communications did intelliARMOR notify
Ondigo of any potential material delay in shipment, despite the fact that the still-pending
MFI certification process entailed uncertainty.  *See* (N.T. 117:8-20).

51.     The record is similarly devoid of any proof or indication that
intelliARMOR otherwise notified Ondigo prior to October 17, 2019 of any material delay
in shipment.

52.     On October 17, 2019, after Ondigo requested an update on the status of the Contract, intelliARMOR notified Ondigo that the certifications required for production had been at the mercy of Apple and the ETL authority; that the lightning cables were finished and would be shipped with the powerbanks following a quality control inspection; and that the 3-in-1 wall charger would be "ready to go" within 12 days (*i.e.*, by October 29, 2019).  (Pretrial Stipulation ¶¶ 14-16; Ex. 10-3, 10-4).

53.     On October 23, 2019, intelliARMOR emailed Ondigo: "Your powerbanks and cables are ready, I'm arranging shipment now. Both turned out great. I don't want to hold up shipment anymore, so when the wall charger / 3-in-1 cable is ready, we will air ship those (should be within 10 days)."  (Pretrial Stipulation ¶ 17; Ex. 10-1, 10-2).

54.     At trial, intelliARMOR presented no proof to substantiate its basis for representing on October 23, 2019 that the 3-in-1 charger would be ready and air shipped within 10 days.  In fact, the 3-in-1 wall chargers never shipped prior to Ondigo's termination of the Contract in December 2019.

55.     As for the powerbanks and lightning cables, intelliARMOR did not ship those items until November 15, 2019.  (Pretrial Stipulation ¶ 18).

56.     The November 15, 2019 shipment did not arrive in port until December 21, 2019.   (Pretrial Stipulation ¶ 21).

57.     The shipment of these items on November 15, 2019 represented an additional material delay by intelliARMOR.  Anderson testified that quality control was a quick inspection to check the quality of the goods (N.T. 171:2-6); and that it generally took 1-2 weeks to arrange shipment (Id.).  The difference between October 17, 2019 and November 15, 2019 is 29 days.  Anderson's testimony therefore does not credibly

account for 29 days that it took intelliARMOR to quickly inspect and ship the goods, thereby indicating that intelliARMOR materially delayed shipment beyond what was represented in the October 17, 2019 and October 23, 2019 emails.

58.     On November 19, 2019, intelliARMOR emailed Ondigo to communicate that the powerbanks and lightning cables had shipped by sea and to provide tracking information for the shipment, which indicated a December 21, 2019 arrival date.  (Pretrial Stipulation ¶ 19).

59.     Upon receiving the November 19, 2019 email, Ondigo raised concerns regarding the delay of shipment and the legitimacy of the MFI certifications.  (N.T. 47:21-48:19; 55:2-56:4).

60.     Radack testified that on or around December 4, 2019, Ondigo communicated to intelliARMOR that it would not accept the shipment of goods, that Anderson threatened to sue on account of Ondigo's refusal to accept the goods, and that Radack encouraged Anderson to instead find an alternate buyer for the goods that Ondigo had rejected.  (N.T. 57:14-58:12).

61.     Radack, who by that time was no longer affiliated with Ondigo, offered to help intelliARMOR find an alternate buyer for the goods.  On December 4, 2019, Anderson thanked Radack "for the help getting this cleaned up" and coordinated with Radack to identify an alternate buyer for the goods.  (N.T. 57:14-58:4; Ex. Ondigo 13-4).

62.     On December 20, 2019, Ondigo again communicated to intelliARMOR that it would not accept shipment of the goods.  (Pretrial Stipulation ¶ 21).

63.     Despite promising on October 23, 2019 that the 3-in-1 wall chargers would be air shipped within 10 days, the 3-in-1 wall chargers were never shipped to

Ondigo (N.T. 148:5-11); and the record is devoid of any communication from intelliARMOR subsequent to the October 23, 2019 email regarding the status of the 3-in-1 wall chargers.

64.    intelliARMOR's excuse for its failure to ship the 3-in-1 wall chargers as promised in the October 23, 2019 email is that it intended to arrange for the arrival of the 3-in-1 wall chargers to coincide with the arrival of the shipment of lightning cables and powerbanks.  (N.T. 148:12-150:3).  This plan to coordinate simultaneous arrival of all of the Goods was not mentioned in the October 23, 2019 email or otherwise communicated to Ondigo.

65.    This plan to time the arrival of the air shipment of the 3-in-1 wall chargers to coincide with the arrival of the shipment of lightning cables and powerbanks via sea directly contradicts the October 23, 2019 representation that the 3-in-1 wall chargers would be air shipped within 10 days.  (Ex. Ondigo 10-1).  Anderson testified that shipment via sea took 3-4 weeks in transit, and an additional 1-2 weeks to arrange for shipment; and that air shipment took 4-5 days in transit.  (N.T. 110-19-23; 167:7-10). Given that intelliARMOR was still arranging sea shipment of the lightning cables and powerbanks as of the October 23, 2019 email and that the shipment therefore would not arrive in port until at least another 3-4 weeks later, intelliARMOR's representation that it would air ship the 3-in-1 wall chargers within 10 days of October 23, 2019 would have resulted in the 3-in-1 wall chargers arriving in approximately 14 days (*i.e.*, November 6, 2019), which is well before the lightning cables and powerbanks even shipped and approximately six weeks before they ultimately arrived in port.

66.     intelliARMOR's plan to time the arrival of the air shipment of the 3-in-1 wall chargers to coincide with the arrival of the shipment of lightning cables and powerbanks via sea is further undermined by the fact that intelliARMOR air shipped a shipment of 100 5,000 mAh powerbanks and 100 10,000 mAh powerbanks in October 2019.  (N.T. 122:21-123:10).   intelliARMOR's air shipment of part of the Goods is inconsistent with its representation that it felt compelled to arrange for all of the items to be delivered to Ondigo through a single lot.

67.     intelliARMOR never air shipped the 3-in-1 wall chargers despite the fact that they should have been shipped by December 18, 2021 if intelliARMOR's did in fact intend to arrange for their arrival to coincide with that of the lightning cables and powerbanks.

68.     The implication of intelliARMOR's failure to air ship the 3-in-1 wall chargers on or before December 18, 2021 is that: 1) they were still not ready for air shipment as of that date; and/or 2) intelliARMOR understood that Ondigo had stated its refusal on December 4, 2019 to accept delivery of the goods.

69.     The weight of testimony and evidence establishes that intelliARMOR's shipment and delivery of the Goods was untimely; that Ondigo never acquiesced to any delays beyond what intelliARMOR represented through its October 23, 2019 email; and that intelliARMOR materially failed to carry out the representations made in its October 23, 2019 email.

70.     The weight of testimony and evidence further establishes that Ondigo notified intelliARMOR on or around December 4, 2019 and again on December 20, 2019 that it would refuse delivery of the Goods.

E.   **Damages**

71.     Radack was Ondigo's General Manager at the time that the parties entered into the Contract.  (N.T. 14:7-10).

72.     As General Manager, Radack was in charge of the day to day operations of Ondigo.  (N.T. 14:3-6).

73.     Based upon his experience as General Manager, Radack testified that, at the time that it placed the Purchase Order, Ondigo's prospects of selling the items from the Contract were very good since: 1) Ondigo was the exclusive dealer for 6,000 retail customers; 2) Ondigo had a reliable forecast of customer needs; and 3) there was a clear demand among Ondigo's customers for affordably priced MFI certified products.  (N.T. 60:13-61:3).  Accordingly, Radack testified that Ondigo felt "very confident" that Ondigo could sell the Goods to its customers.  (Id.).

74.     Radack testified that Ondigo's expectation at the time that it enered into the Contract was that it would sell all of the Goods at a 100% markup.  (N.T. 61:4-16; 63:5-64:3).

75.     Radack also testified that Ondigo's purchase and resale of the Goods would not have increased Ondigo's overhead costs since the purchase and resale would have fit within Ondigo's existing overhead capacity.  (N.T. 64:4-19).

76.     Based upon the testimony of Radack, and accounting for the fact that Ondigo received and accepted shipment of 200 powerbanks (at a total value of $1,370.00) before it cancelled the Contract, and further taking into account that Ondigo never paid the remaining $45,595.00 balance that would have been due upon delivery and acceptance of the Goods, Ondigo suffered lost profits in the amount of $134,045.00.

77.    intelliARMOR never refunded the $45,595.00 deposit paid by Ondigo. (Pretrial Stipulation ¶ 22).

78.    intelliARMOR presented testimony and evidence that it suffered $46,177.75 in losses as a result of Ondigo's cancellation of the Contract.

79.    intelliARMOR alleges that it incurred $2,000 in labor costs to manage inventory and find a substitute buyer.  However, intelliARMOR presented no testimony or evidence that these additional tasks increased intelliARMOR's labor costs (*i.e.*, that they were not within intelliARMOR's existing labor capacity).

### F.    Witness Credibility

80.    Radack presented credible testimony that was substantially consistent with the record and he candidly admitted when he did not remember a given fact.  *See e.g.,* (N.T. 38:4-20).

81.    Anderson's dealings with Ondigo present numerous contradictions and deceptions that undermine his credibility as a witness.

82.    Despite Ondigo's request that delivery timing be confirmed, it is apparent that Anderson deliberately and unreasonably oversold intelliARMOR's ability to deliver the Goods in a timely manner, despite the fact that production of the Goods required a third party approval process that was beyond intelliARMOR's control; and that intelliARMOR never apprised Ondigo of the fact that production could therefore be delayed indefinitely due to uncertainty with respect to the certification approval process. intelliARMOR therefore misled Ondigo by providing an unrealistic timeframe of shipping dates for the Goods and the false impression that delivery timing was confirmed and that it was within intelliARMOR's ability and control.  Anderson testified that he

could not anticipate how long the MFI certification process might take for a given product and that intelliARMOR had "no control over the timeline on the MFI certification."  (N.T. 117:8-20; N.T. 109:14-17).  On the other hand, Radack testified that Ondigo would not have ordered the Goods had intelliARMOR not represented a date certain for delivery.  (N.T. 28:15-20).  If it was at all foreseeable that MFI certification might materially delay production, Anderson should have warned Ondigo of this potential delay.  At the very least, he should reasonably warned Ondigo, upon its request to confirm delivery timing, that the certification process was beyond intelliARMOR's control.  In failing to do so, and by in fact representing that the Goods would be produced and shipped within a specified timeframe, it is clear that Anderson deceptively oversold intelliARMOR's ability to deliver the Goods in a timely manner.  The honest, good faith response to Ondigo's June 5, 2019 request to "confirm" delivery timing should have been to warn Ondigo that timing was subject to a third party certification process that was beyond intelliARMOR's control and which therefore might delay production.  That Anderson instead responded by confirming shipment timing within a specified range of time demonstrates dishonesty and a lack of candor.

83.    Anderson's September 3, 2019 update to Ondigo that shipment would occur within 15 days was clearly false.  At that point, intelliARMOR was still more than a month away from obtaining all required certifications, which intelliARMOR understood to be a process that entailed uncertainty with respect to how long it might take.  (N.T. 173:2-174:4; Ex. intelliARMOR 0051).  Even had they obtained all required certifications by September 3, 2019, it is highly doubtful that intelliARMOR could have completed production, packaging, and quality control and arranged shipment within 15

days.  By point of reference, it took intelliARMOR 24 days (from October 22, 2019 to November 15, 2019) to simply arrange shipment of the lightning cables once they were finished and inspected.  (N.T. 170:12-171:6; Ex. Ondigo 15).  The clear implication of intelliARMOR's misleading September 3, 2019 communication is that it sought to buy time with false assurances while it worked on finalizing certifications and production, thus demonstrating further dishonesty and lack of candor.

84.     Anderson's October 23, 2019 representation to Ondigo that intelliARMOR would air ship the 3-in-1 wall chargers within 10 days was false.  *c.f.* ¶ 60, *supra* (regarding intelliARMOR's contradictory claim that it intended to sdeliver the entire lot in one shipment).  Again, the implication of this lie is that Anderson sought to placate Ondigo with a false assurance of upcoming delivery in order to buy intelliARMOR additional time to seek to finalize certifications and production before Ondigo cancelled the Contract.

85.     Anderson's testimony also presents numerous contradictions that undermine the credibility of his testimony.  *See* ¶¶ 35, 38 *supra* (contradictions regarding Anderson's testimony that payment of the deposit was required to begin production); ¶¶ 29-31, *supra* (contradictions regarding Anderson's testimony that the due date appearing on the invoice related to a price hold deadline); ¶¶ 64-66, supra (contradictory testimony regarding intelliARMOR's excuse that it delayed air shipment of the 3-in-1 wall chargers in order to arrange for simultaneous arrival of the Goods).

86.     Anderson's testimony that intelliARMOR would not have accepted the Purchase Order if it required a shipment or delivery date (N.T. 107:22-25) is inconsistent with Anderson's June 5, 2019 representation of shipping dates in response to Ondigo's

request that delivery dates be "confirmed."  If Anderson's intention was in fact to avoid

binding intelliARMOR to any obligation with respect to shipment or delivery date, this

logically should have been expressed or qualified in his response of June 5, 2019 through

which he confirmed delivery dates.  His failure to do so therefore undermines his

contradictory testimony.

## II.      PROPOSED CONCLUSIONS OF LAW

1.      The subject matter of this action involves the sale of goods between two

commercial businesses for delivery of goods in Pennsylvania and therefore falls within

the scope of Article 2 of Pennsylvania's Uniform Commercial Code, 13 Pa.C.S. §§ 2101

*et seq.*  13 Pa.C.S. § 2102.

2.      intelliARMOR's issuance of the Invoice to Ondigo on July 15, 2019 in

response to Ondigo's submission of the Purchase Order constituted written acceptance of

the Purchase Order.  13 Pa.C.S. § 2207.  Although the Invoice stated an additional term

with respect to the requirement that Ondigo pay a deposit for the Purchase Order and

added an unlabeled September 3, 2019 due date, intelliARMOR did not expressly

condition the parties' agreement upon Ondigo's acceptance of these additional

terms.  The Purchase Order therefore constitutes the parties' written agreement with

respect to the subject matter, which in turn was supplemented by the additional terms

stated in the Invoice.  13 Pa.C.S. § 2207(a).  The additional terms stated in the Invoice

were not objected to by Ondigo and did not materially alter the Purchase

Order.  Accordingly, these additional terms became part of the parties' agreement with

respect to the subject matter of the Purchase Order.  13 Pa.C.S. § 2207(b).

3.      Even with these additional terms, the Contract was not intended as a complete and exclusive statement of the terms of the parties' agreement with respect to the subject matter.  The Purchase Order and Invoice are each skeletal documents which omit numerous material terms, including *inter alia* an express statement of timing of the purchase order, the due date for the deposit, the effect of the deposit, and the parties' rights upon default.  The Purchase Order and Invoice each additionally lacked any integration clause.  Accordingly, consistent additional terms may be used by the Court to explain or supplement the parties' agreement.  13 Pa.C.S. § 2202.

4.      The parties' understanding that the goods would be shipped via sea within approximately 55 days of the Contract constituted consistent additional terms which may be used by the Court to explain or supplement the parties' agreement.  This agreement as to the timing for shipment is consistent with the written terms of the Purchase Order and the Invoice.  By specifically requesting during the parties' negotiation of the Contract that delivery timing be "confirmed," Ondigo communicated that time was of the essence; and intelliARMOR's response to said request, with a listing of shipment dates via sea, constituted an agreement and understanding that the timing of shipment was confirmed between the parties.  Additionally, the parties' agreement that the goods would be shipped via sea within approximately 55 days of the Contract is corroborated by the parties' subsequent course of dealing, whereby intelliARMOR made several assurances that the goods would be shipped by early-to-mid September, which substantially aligned with the approximately 55 day timeframe for shipment via sea.  Although approximately 36 days elapsed from intelliARMOR's June 5, 2019 spreadsheet in response to the request to confirm delivery timing and Ondigo's submission of the Purchase Order on

July 11, 2019, the record is devoid of any proof or indication that intelliARMOR ever communicated to Ondigo that the confirmed delivery timing was specific to June 5, 2019 or that it would not inform the timing of delivery if the order were placed at a later date.  Accordingly, the Court concludes that the parties' prior agreement and understanding that the Goods would be shipped via sea within approximately 55 days of the Contract was part of the parties' contract with respect to the subject matter of the Contract.

5.      Additionally, the parties' prior understanding and agreement during negotiations that the goods would ship within approximately 55 days of the Contract establishes what would have constituted a "reasonable time" for shipment, pursuant to 13 Pa.C.S. § 2309(a).  The time for shipment, if not otherwise provided or agreed upon, shall be a "reasonable time."  Id.  What constitutes a "reasonable time" depends on the nature, purpose, and circumstances. 13 Pa.C.S. § 1205. Assuming *arguendo* that the parties' agreement could be construed such that the approximately 55 day window for shipment of the Goods was not part of the parties' contract with respect to the subject matter of the Contract, the parties' recent confirmation of delivery timing during the course of negotiations significantly informs the nature, purpose, and circumstances of the Contract.  By explicitly requesting upfront that delivery timing be "confirmed," Ondigo communicated that time was of the essence for delivery of the Goods; and by responding to Ondigo by providing a listing of shipping dates via sea, intelliARMOR communicated its understanding and agreement that time was of the essence.  Radack also testified that he verbally confirmed this delivery timing with intelliARMOR.  Beyond intelliARMOR communicating on June 17, 2019 that the MFI certification process might entail a minor

delay in production and shipment, intelliARMOR never communicated prior to the parties' mutual agreement to the Purchase Order and Invoice that the agreed upon shipping times were no longer valid or applicable, despite its awareness that Ondigo intended for delivery timing to be confirmed.  Furthermore, Ondigo presented compelling testimony that timing was critical to Ondigo's operations, while intelliARMOR also acknowledged that the market was subject to price fluctuations which logically bears on the importance of timing.  Although production and shipment of the Goods was ultimately delayed on account of the MFI certification process, the record is devoid of any indication or suggestion that intelliARMOR communicated prior to the parties' agreement that such delays were foreseeable.  Whereas Ondigo expressly demanded to "confirm" delivery timing and intelliARMOR responded with specific shipping dates, intelliARMOR never communicated to Ondigo that the timing of shipment was subject to third party approvals that might foreseeably cause a material delay to production and shipment.  Instead, intelliARMOR "confirmed" delivery timing on June 5, 2019 and never communicated any changes to that confirmed delivery timing beyond its June 17, 2019 email that the MFI certification process might entail a minor delay.  Furthermore, Anderson testified that he in fact believed that shipment would occur in accordance with the timeframe represented in the June 5, 2019 spreadsheet.  Under the totality of circumstances, the parties' confirmed understanding and agreement that the Goods would be shipped within approximately 55 days of the parties' agreement constituted a "reasonable time" for intelliARMOR's shipment of the Goods, subject to allowance for a minor delay as could be reasonably foreseen on account of intelliARMOR's June 17, 2019 notice to Ondigo that the MFI certification process might delay production "a

bit." In light of the fact that the parties reached their contractual agreement on or around July 15, 2019, the parties' final contractual agreement required that intelliARMOR ship the Goods via sea on or around September 8, 2019, with allowance for a minor delay on account of reasonably foreseeable delays with respect to the MFI certification process.

6.     intelliARMOR's partial shipment of goods on November 15, 2019 did not fall within a reasonable time pursuant to 13 Pa.C.S. § 2309(a) and thereby materially deviated from the parties' contractual agreement. Approximately 123 days elapsed from the parties' contractual agreement on July 15, 2019 and the November 15, 2019 shipment via sea. Before the parties entered into their binding contract, intelliARMOR did nothing to foreseeably warn Ondigo that the previously confirmed timing for shipment might be prolonged by nearly 70 days. In light of the fact that Ondigo previously sought to explicitly "confirm" delivery timing, intelliARMOR's subsequent notice that the MFI certification process might entail "a bit" of a delay did not reasonably put Ondigo on notice that such a substantial delay to the confirmed timing for shipment might be foreseeable.

7.     Beyond that, intelliARMOR still never shipped the 3-in-1 wall chargers, which formed a material part of the Contract, *viz*: $17,000.00 of the goods included in the Contract. The parties' agreement was unequivocally terminated by Ondigo on December 20, 2019. Shipment of the 3-in-1 wall chargers after December 20, 2019 would not have been within a reasonable time pursuant to 13 Pa.C.S. § 2309(a). Particularly in light of Ondigo's specific request to confirm delivery timing during the course of negotiations, the Contract cannot reasonably be construed to give intelliARMOR license to delay

shipment indefinitely.  intelliARMOR's failure to ship the 3-in-1 charges as of December 20, 2019 falls well beyond any conceivable reasonable time for shipment.

8.    Ondigo's approximately 20 day delay in paying the deposit did not excuse intelliARMOR's delay in shipping the Goods.  The parties' contractual agreement represented a binding obligation upon both parties to perform their duties under the Contract.  13 Pa.C.S. § 2609(a).  If any delay in Ondigo's payment of the deposit caused intelliARMOR any concern or otherwise impacted its ability to perform under the Contract, the appropriate remedy would have been for intelliARMOR to seek adequate assurance from Ondigo that payment of the deposit was forthcoming.  Id.

9.    Payment of the deposit was not a condition precedent for intelliARMOR to commence production; and Ondigo's alleged delay in paying the deposit therefore did not excuse intelliARMOR's delay in beginning production upon the parties' contractual agreement.  Generally, an event mentioned in a contract will not be construed as a condition precedent unless expressly made such a condition.  W. Dev. Grp., Ltd. v. Horizon Fin., F.A., 592 A.2d 72, 76 (Pa. Super. 1991).  Because payment of the deposit was not expressly stated as a condition precedent to the commencement of production, any potential delay by Ondigo in paying the deposit did not delay intelliARMOR's obligation to begin production of the Goods.  Furthermore, assuming *arguendo* that payment of the deposit could be construed as a condition precedent to commencement of production, such condition would have had no logical bearing upon intelliARMOR's duty to obtain MFI certifications, which were not part of the production process and were instead a requirement that needed to be met before production could commence.  At any

rate, intelliARMOR waived any possible condition precedent by in fact commencing with production before the deposit was received.

10.    The timing of shipment was material to the parties' contractual agreement.  By requesting that intelliARMOR confirm delivery timing, Ondigo notified intelliARMOR that time was of the essence.  At the very least, Ondigo's request to confirm delivery timing notified intelliARMOR that timing was material to Ondigo.  Aside from providing Ondigo with shipping dates, intelliARMOR demonstrated its understanding that timing was material to the transaction by providing Ondigo with periodic updates regarding the timing of shipment, some of which proved to be deceptively optimistic; and by air shipping an initial shipment of goods in October 2019.

11.    Modification of the parties' contractual agreement would have required a written agreement between the parties since the Contract involved the sale of goods for the price of $500 or more.  13 Pa.C.S. § 2209(c).  No such modification occurred.  Therefore, the parties' agreement that the Goods be shipped on or around September 8, 2019 remained a part of the agreement.

12.    intelliARMOR breached the parties' contractual agreement by failing to ship the Purchase Order to Ondigo on or around September 8, 2019.

13.    intelliARMOR's breach of contract occurred on or around September 8, 2019, at which point it was within Ondigo's right to either seek assurance that intelliARMOR would promptly ship the goods or terminate the parties' contract.  (13 Pa.C.S. § 2609(a); 13 Pa.C.S. § 2601.

14.    Where tender of delivery fails in any respect to conform to the parties' contract, the buyer may reject the whole purchase.  13 Pa.C.S. § 2601.  Section 2601

follows the fundamental principle of contract law that a non-breaching party is entitled to terminate a contract upon the other party's breach.  *See generally* <u>Francis Gerard Janson, P.C. v. Frost,</u> 618 A.2d 1003, 1006 (Pa. Super. 1993).  intelliARMOR's failure to timely ship the Goods constituted a failure to tender delivery in conformance to the parties' contract, thereby constituting a breach of contract warranting Ondigo's termination of the Contract.

15.     A buyer's rejection of nonconforming goods must be made within a reasonable time.  13 Pa.C.S § 2602, Official Comment.  On October 17, 2019 and October 23, 2019, intelliARMOR notified Ondigo that the shipment of the Goods was late, but also promised to promptly ship part of the order via sea and to ship the balance of the Goods via air shipment within 10 days of October 23, 2019.  Although it was within Ondigo's rights to terminate the Contract upon learning of these delays, Ondigo's failure to do so within a reasonable time constituted acquiescence to the assurances communicated through intelliARMOR's October 23, 2019 email, *viz*: prompt sea shipment of part of the Goods with air shipment of the balance of the Goods to follow by November 2, 2019 (*i.e.*, 10 days from October 23, 2019).  However, Ondigo did not acquiesce to any delays beyond what was represented by intelliARMOR in the October 23, 2019 email.

16.     Through a November 19, 2019 email from intelliARMOR, Ondigo was first notified that intelliARMOR had failed to promptly ship part of the Goods via sea, as promised in the October 23, 2019 email.  Through the November 19, 2019 email, Ondigo was notified that the partial sea shipment had not shipped until November 15, 2019, approximately 23 days from the date of the October 23, 2019 update; and that the partial

shipment would not arrive in port until December 21, 2019. The timing of this partial shipment was materially slower than could have been reasonably anticipated by Ondigo upon receipt of the October 23, 2019 update, particularly given that shipment of the Goods was already substantially late by that time. Upon learning of this additional delay, Ondigo communicated its rejection of the Goods before the partial shipment arrived in port, which constituted a reasonable time for rejection under the circumstances.

17.     Furthermore, intelliARMOR's failure to air ship the 3-in-1 wall chargers within 10 days of the October 23, 2019 email constituted an additional failure by intelliARMOR to conform to the parties' contract, thereby entitling Ondigo to reject the reject the whole purchase. 13 Pa.C.S. § 2601. The 3-in-1 wall chargers formed a material part of the Contract and were never shipped to Ondigo prior to its rescission of the Contract. intelliARMOR testified that the parties' contract required that the entire Contract be delivered as a single lot. Ondigo never acquiesced to any delay beyond what was communicated by intelliARMOR in the October 23, 2019 email, *viz*: air shipment of the 3-in-1 wall chargers within 10 days.

18.     Ondigo's rescission of the Contract prior to intelliARMOR's shipment of the 3-in-1 wall chargers occurred within a reasonable time of intelliARMOR's failure to air ship the 3-in-1 wall chargers within 10 days of October 23, 2019. It would not be reasonable to construe an arbitrary deadline for Ondigo's rescission of the Contract since doing so would in effect issue intelliARMOR a blank check with regard to the timing of shipment, thereby undermining the contractual agreement that shipment occur within a reasonable time. In this instance, Ondigo's rescission of the Contract before intelliARMOR's shipment of the 3-in-1 chargers constituted a reasonable time within

which to rescind the Contract upon intelliARMOr's breach for failure to ship the 3-in-1 chargers as promised in the October 23, 2019 email.

19.     Upon a seller's breach, a buyer is entitled to recover so much of the price as has been paid, together with any incidental and consequential damages but less expenses saved in consequence of the breach by the seller.  13 Pa.C.S. § 2711(b); 13 Pa.C.S. § 2713.  Lost interest constitutes a "reasonable expense incident to the delay or breach" as referenced in 13 Pa.C.S. § 2715.  Frank B. Bozzo, Inc. v. Elec. Weld Div. of Fort Pitt Div. of Spang Indus., Inc., 498 A.2d 895, 898 (Pa. Super. 1985).  *See also* Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 590 (Pa. Super. 2003) (holding that a prevailing party in a contract case is entitled to prejudgment interest, as of right, at the legal rate of 6% from the date of the breach).  As a result of intelliARMOR's breach, Ondigo is entitled to damages in the amount of: $45,595.00 representing the amount of deposit paid, plus lost profits in the amount of $134,045.00, minus the $45,595.00 balance that Ondigo withheld upon its termination of the Contract; and interest at the legal rate of interest (6%) from the date of intelliARMOR's breach.  The amount of principal due to Ondigo is $134,045.00.  Interest at a daily rate of $22.03 is chargeable as of October 23, 2019, which is when intelliARMOR failed to ensure prompt delivery of the partial sea shipment.  The total amount of interest due as of February 11, 2022 is therefore $18,531.27.  The total amount of damages owed to Ondigo as of February 11, 2022 is $152,576.27.

20.     Although Radack was no longer employed by Ondigo at the time that intelliARMOR breached the Contract, he managed Ondigo at the time that it entered into the Contract and was therefore competent to testify as to consequential damages.

Consequential damages must have been reasonably foreseeable at the time a contract was made.  Frank B. Bozzo, Inc. v. Elec. Weld Div. of Ft. Pitt Bridge Div. of Spang Indus., Inc., 423 A.2d 702, 709 (Pa. Super. 1980), aff'd sub nom. Frank B. Bozzo, Inc. v. Elec. Weld Div. of Fort Pitt Bridge Div. of Spang Indus. Inc., 435 A.2d 176 (Pa. 1981). Radack provided competent testimony as to Ondigo's expected profits from the Contract, as of the date that the Contract was entered into, at which time he was General Manager of Ondigo.

Respectfully submitted,

DAVID HUSSEY
Counsel for Plaintiff

Dated: February 11, 2022